**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

DAVID BONDS,
      *Plaintiff*,

*v.*                                     CASE NO. 13-CV-13846

COMMISSIONER OF             DISTRICT JUDGE PATRICK J. DUGGAN
SOCIAL SECURITY,         MAGISTRATE JUDGE CHARLES E. BINDER

      *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.    RECOMMENDATION

This Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment (docket 15) be denied, that Defendant's Motion for Summary Judgment (doc. 18) be granted, and the decision of the Commissioner be **AFFIRMED**.

### II.    REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for supplemental security income benefits (SSI). The matter is currently before this Court on cross-motions for summary judgment.[2] (Docs. 15, 18.)

---

[1]The format and style of this Report and Recommendation comply with the requirements of Fed. R. Civ. P. 5.2(c)(2)(B). This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

[2]The Court has reviewed the pleadings and dispenses with a hearing pursuant to Eastern District of Michigan Local Rule 7.1(f)(2).

Plaintiff filed an application for SSI on May 14, 2010, alleging that he became unable to work on September 18, 2008. (Transcript, Doc. 11 at 27, 69, 141-44.) Plaintiff's claims were denied at the initial administrative stages. (Tr. 69, 70-79, 80-83.) On November 1, 2011, Plaintiff appeared at a hearing before Administrative Law Judge ("ALJ") Kathleen H. Eiler, who considered the application for benefits *de novo*. (Tr. 27, 42.) In a decision dated December 9, 2011, the ALJ found that Plaintiff was not under a disability within the meaning of the Social Security Act at any time from May 14, 2010, the date of application, through the date of the ALJ's decision. (Tr. 37.) Plaintiff requested Appeals Council review of this decision. (Tr. 23.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on July 25, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. 1-7.) On September 10, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

## B.      Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions.  Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is "more than a scintilla . . . but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not

the function of this Court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports another conclusion. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)(citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)(en banc)(citations omitted)).

"Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party")(citations omitted); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. Appx. 521, 526 (6th Cir. 2006).

C.       **Governing Law**

Disability for purposes of SSI is defined as being:

> [U]nable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a)(SSI). Plaintiff's Social Security disability determination is to be made through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. § 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003)(cited with

approval in *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 540 (6th Cir. 2007)); *see also Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)("[c]laimant bears the burden of proving his entitlement to benefits."). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *See Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. § 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since May 14, 2010, the application date. (Tr. 29.) At step two, the ALJ found that Plaintiff's history of ankle fracture, chronic back pain, headaches, obesity, anxiety disorder, and affective disorder were "severe" within the meaning of the second sequential step and his sleep apnea was non-severe. (*Id.*) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. 29-31.) The ALJ found that the Plaintiff had the residual functional capacity (RFC) to perform a light work as defined in the Regulations with the following limitations:

> [T]he claimant can never push or pull or operate foot pedals with his right lower extremity. He can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs. Likewise, the claimant can occasionally stoop, crouch, kneel, and crawl. The claimant should avoid concentrated exposure to workplace hazards, such as moving machinery and unprotected heights. He retains the mental capacity to perform simple, routine, repetitive task (sic). The claimant can occasionally interact with supervisors and coworkers, but should never interact with the general public. He requires a low-stress work environment, meaning only occasional changes in a routine work setting. (Tr. 31.)

5

At step four, the ALJ found that Plaintiff could not perform any of his past relevant work. (Tr. 36.) At step five, the ALJ found that Plaintiff could perform jobs existing in significant numbers in the national economy and therefore he was not suffering from a disability under the Social Security Act. (Tr. 36-37.)

### E.    Administrative Record

Plaintiff was 41 years old at the time of the hearing. (Tr. 45.) He testified that he cannot work due to back pain, "chronic headaches", and problems with his ankle and foot, which swells when he stands or walks on it for a long time. (Tr. 46.) Plaintiff brought a list of medications to the hearing, from which the ALJ confirmed that Plaintiff takes Claritine, Norvasc and clonidine for high blood pressure, Flexeril, Zestril, Zocor, Lortab, Nexium, Effexor for headaches, and Flonase. (Tr. 46-48.) When questioned about side effects, Plaintiff testified that the Lortab makes him sleepy, the Effexor makes him "out of it" and the nozzle spray clears his congestion, nose and sinuses. (Tr. 47.)

Plaintiff testified that he uses a cane all of the time, but it was not prescribed. (Tr. 48.) He testified that his right ankle gives him trouble and he uses the cane for balance when he stands up. (*Id.*) Plaintiff explained that he does not have Medicaid, but he is covered by the Saginaw Health Plan. (Tr. 49.)

Plaintiff testified that he has never had a driver's license, though he took the test when he was 16. (*Id.*) He testified that he did not have his glasses at that time and they were needed to retake the test. (*Id.*) He explained that he lives alone in a house, but a family friend, his mother and his brother come over to help and clean. (Tr. 49-50.) Plaintiff testified that he does not have hobbies, but he tries to read during the day and he loses focus on what he is reading. (Tr.  50.) He

takes his medication and watches television during the day. (Tr. 51.) He described that he can

bathe himself, but if he has leg or back pain, he needs help to get out of the tub. (*Id.*) Plaintiff

testified that he has not been able to attend physical therapy because they would not take his health

plan. (Tr. 55.) He testified that he can sit in a chair for approximately 30 or 35 minutes before he

has pain in his lower back and has to move, he cannot stand for a prolonged period of time without

his cane but he can stand 30 or 35 minutes with his cane, and he cannot walk without his cane but

he can walk about two blocks with his cane. (Tr. 57.) He testified that he is right-handed and he

can lift and carry approximately ten pounds. (Tr. 57-58.)

He testified that he has headaches every day yet medication relieves the headaches. (Tr. 52-

53.) Plaintiff testified that he "sees things" approximately every other day, including his deceased

uncle. (Tr. 54.) He said the uncle tells him to "[s]tay strong." (*Id.*) Plaintiff explained that he was

incarcerated for approximately eight months from 2009 to 2010 for missing a probation report. (Tr.

55.) He said he was on probation for drug use, and confirmed with the ALJ that the drug charges

were from 2000 or 2011 and that he has not used drugs since then. (Tr. 56.) Plaintiff testified that

he drinks alcohol two to three times per month and has four or five beers. (*Id.*)

Plaintiff challenges only the ALJ's findings with respect to Plaintiff's mental impairments

and limitations. While the record has been reviewed in full, the medical evidence will be discussed

herein briefly and set forth in detail below where it is relevant to the analysis.

In December 2006 Plaintiff suffered a calcaneal fracture/subtalar subluxation on the right.

(Tr. 510.) He reported that he sustained the injury while running away from a dog.[3] (Tr. 500, 502.)

---

[3] Records from April 2010 note that Plaintiff "states that his right ankle was fractured and dislocated in an escape attempt over a fence." (Tr. 447.) Another 2006 report notes that Plaintiff reported having fallen down a stairway. (Tr. 414, 420.)

December 30, 2006 x-rays of his right foot revealed "[i]mproved alignment post reduction of fracture/subluxation." (Tr. 521.) In 2008 he was diagnosed with hypertension, muscle spasms and right foot pain. (Tr. 577.) A September 2008 x-ray of the right foot revealed "mild malalignment at the talonavicular joint, navicular-1st cuneiform joint, and widening of the calcaneocuboid joint. Small bony density at the medial aspect of the navicular and anterior aspect of the calcaneus may correlate with the old fracture fragments described previously. Soft tissues are unremarkable." (Tr. 573.) In 2009 he was diagnosed with hypertension (non-compliant, uncontrolled) and obesity and it was noted that he needed fasting labs taken. (Tr. 576.) On December 27, 2010, Charles Ellsworth, D.O., noted that Plaintiff "is wanting a cane for his foot. I told him that a cane will not help his foot." (Tr. 539.)

On April 19, 2010 Plaintiff reported to the hospital with complaints of right flank pain, back pain, urinary frequency, chest pain and ankle pain. (Tr. 561.) Xiuxian A. Zhu, M.D., consulted on Plaintiff's chest pain on April 20, 2010. (Tr. 556-58.) The Consultation Report notes that Plaintiff had negative cardiac enzymes and no EKG changes. (Tr. 557.) He was diagnosed with a history of hypertension, now hyperlipidemia, and atypical chest pain. (*Id.*)

Plaintiff underwent a sleep study for his sleep apnea in November 2010. It was noted that "he has provided a sleep log suggesting he may go to bed after midnight and wakeup usually around 5:00 a.m., . . . " and that Plaintiff reported taking brief naps during the day. (Tr. 552.) It was also noted that in a pre-study questionnaire, Plaintiff indicated a usual bedtime of 9:00 p.m. and waking up at 5:00 a.m. (*Id.*) The testing revealed "severe obstructive sleep apnea disorder," and Plaintiff was to be offered a CPAP titration study. (*Id.*)

The ALJ found that Plaintiff had past relevant work as a truck washer, clothes tagger, insulation worker and bricklayer helper. (Tr. 36.) The vocational expert ("VE") testified that

Plaintiff's past work as a truck washer was unskilled, Specific Vocational Preparation (SVP) level 1, medium in exertion per the Dictionary of Occupational Titles (DOT) and light to medium in exertion according to Plaintiff's description. (Tr. 59.) His past work as a clothes tagger was SVP 2, medium in exertion per the DOT and light to medium according to Plaintiff's description and his past work as an insulation worker was skilled with an SVP 6, medium in exertion per the DOT and light to medium according to Plaintiff. (*Id.*) His past work as a bricklayer helper was SVP 2, very heavy per the DOT and medium to heavy according to Plaintiff's description. (*Id.*)

The ALJ asked the VE to consider an individual of Plaintiff's age, education and work experience who is limited as follows:

> He can never push, pull or operate foot pedals with his right lower extremity. He can never climb ladders, ropes or scaffolds, but can occasionally climb ramps or stairs; occasionally stoop, crouch, kneel or crawl.
>
> He should avoid concentrated exposure to workplace hazards such as moving machinery and unprotected heights. He retains the mental capacity to perform simple, routine, repetitive tasks and he can occasionally interact with supervisors and co-workers, but should never interact with the general public. He requires a low-stress work environment, meaning only occasional changes in a routine work setting. (Tr. 59-60.)

The VE testified that such a person could not perform Plaintiff's past work. (Tr. 60.) The VE gave the following examples of light exertion, unskilled work that such an individual could perform: assembly at a bench or table with 4,500 jobs in the region defined as the state of Michigan, and a representative DOT code 759.684-034; packager at a bench or table with 2,500 jobs in the region and a representative DOT code 525.687-118; and dishwasher with approximately 2,000 jobs in the region and a representative DOT code 311.677-010. (*Id.*)

For the second hypothetical question, the ALJ asked the VE to consider the same limitations as set forth in the first hypothetical question, with the additional limitation to work at the sedentary

exertional level. (*Id.*) The VE testified that such an individual could perform jobs including assembly at a bench or table with approximately 1,700 jobs and a representative DOT code 715.684-138, packager at a bench or table with approximately 1,000 jobs and a representative DOT code 737.587-010 and inspection at a bench or table with 600 jobs and a representative DOT code 669.687-014. (Tr. 61.)

Finally, the ALJ asked the VE what result if she added to either of the prior hypotheticals a limitation that the individual would be off task at least 15 percent of the workday. (*Id.*) The VE opined that such a limitation would be work preclusive. (*Id.*) Plaintiff's attorney then questioned the VE and asked her what result if an individual required a sit/stand option at will, and when standing "was using a cane in the dominant hand." (*Id.*) The VE testified that the positions she had listed required the use of both hands and the jobs would not be available. (Tr. 62.)

**F.     Analysis**

Plaintiff contends that the ALJ failed to properly evaluate the medical records, the ALJ's hypothetical question did not accurately portray Plaintiff's impairments and limitations, the resultant RFC was flawed and therefore, the ALJ cannot rely on the VE's testimony as substantial evidence in support of her determination that there are significant numbers of jobs Plaintiff can perform in the economy. (Doc. 15.)

**1.     Whether The ALJ Properly Considered Dr. Douglass's Medical Opinion**

Plaintiff argues that the ALJ erred in failing to "fully and properly evaluate all the opinions of Dr. Douglass" including Dr. Douglass's opinion that Plaintiff had moderate restrictions in activities of daily living. (Doc. 15 at 15, tr. 74.) In other words, Plaintiff faults the ALJ's findings regarding non-exertional impairments.  The Commissioner has developed a special technique for evaluating such impairments.  This special technique is the process for evaluating the severity of

a mental impairment or impairments. First, the fact finder must evaluate the symptoms, signs and laboratory findings to determine whether there is a medically determinable impairment. *See* 20 C.F.R. 416.920a(b)(1).  Next, the fact finder rates the "degree of functional limitation resulting from the impairment(s)." 20 C.F.R. 416.920a(b)(2). The Psychiatric Review Technique (PRT) is a worksheet for determining whether Plaintiff has medically determinable impairments, and if so, their severity.

Bruce G. Douglass, Ph.D., a non-examining consultative medical evaluator, completed a Psychiatric Review Technique (PRT) and a Mental Residual Functional Capacity Assessment dated September 27, 2010. (Tr. 74-77.) Dr. Douglass opined that Plaintiff has an affective disorder and anxiety disorder. (*Id.*) As part of the PRT, Dr. Douglass opined that Plaintiff had moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace and no repeated episodes of decompensation. (*Id.*)

After review of the record, I suggest that the ALJ properly applied the special technique. The ALJ followed the prescribed rules for evaluating Plaintiff's mental impairments.  *See* 20 C.F.R. § 416.920a. The ALJ properly measured the severity of Plaintiff's mental disorder in terms of four functional areas, known as the "B" criteria, by determining the degree of limitation in each area.  *See* 20 C.F.R. § 416.920a(c)(3). The ALJ determined that Plaintiff has mild limitations in activities of daily living, moderate limitations in social functioning and moderate limitations in maintaining concentration, persistence and pace and that there have been no episodes of decompensation. (Tr. 30-31.) In making these findings, the ALJ considered the medical records and other evidence of record, including Plaintiff's testimony and reports.  (*Id.*) The ALJ gave reasons to support the limitations set forth in each of the areas of functioning. (*Id.*)

The ALJ is required to consider all evidence of record in assessing the functional limitations. The Regulations provide that the ALJ is required "to consider multiple issues and all relevant evidence to obtain a longitudinal picture of [the claimant's] overall degree of functional limitation." 20 C.F.R. 416.920a(c)(1). The ALJ had the benefit of both Dr. Douglass's opinion as well as Plaintiff's testimony, to which she referred in her decision. As the ALJ pointed out with respect to activities of daily living, Plaintiff lives alone, though he has someone check on him several times a week. The ALJ also cited Plaintiff's report regarding his personal needs, which shows that many of the related difficulties are physical. (Tr. 30, 153.) Plaintiff reported that he has difficulty dressing because his back hurts when he bends over, and he has difficulty bathing because he cannot reach all over himself. (Tr. 153.) The ALJ provided reasons for concluding Plaintiff had mild limitations related to his mental impairments in activities of daily living.

Even a finding of moderate limitations in activities of daily living does not equate to a finding of disability. The Regulations provide that a five-point scale be used to rate the degree of limitation: none, mild, moderate, marked, and extreme. *See* 20 C.F.R. 416. 920a(c)(4). "The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity." If the mental impairment(s) is determined to be severe, then the ALJ must determine whether it meets or equals a listed mental disorder, in this case, 20 C.F.R. Part 404, Subpart P, Appendix 1, Listings 12.04 (affective disorders) or 12.06 (anxiety-related disorders). *See* 20 C.F.R. 416.920a(d)(2). Both Listings require that the mental impairments result in "marked" restriction or difficulties in at least two of the "B" criteria functional areas, or one "marked" rating and "[r]epeated episodes of decompensation, each of extended duration." 20 C.F.R. Part 404, Subpart P, Appendix 1, Listings 12.04, 12.06. Therefore, even if the ALJ erred in failing to explain why her functional limitation assessment varies from Dr. Douglass's within

activities of daily living, and substantial evidence showed Plaintiff has moderate restrictions in activities of daily living, such error would be harmless and would not change the determinations at steps two or three. I suggest that the ALJ properly considered and explained Dr. Douglass's opinion and did not err in finding Plaintiff had only mild restrictions in activities of daily living

Next, Plaintiff argues that the ALJ erred by failing to mention and evaluate Dr. Douglass's opinions that Plaintiff was moderately limited in the following areas: "[t]he ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance" and "[t]he ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 76-77, Doc. 15 at 16.)

"Several courts within the Sixth Circuit and elsewhere have addressed the issue raised by plaintiff regarding the mental assessment and have all found that Section I of the mental assessment is merely a worksheet and does not constitute the RFC assessment." *Joiakim v. Comm'r of Soc. Sec.*, 2011 WL 1120043, at *6 (E.D.Mich. Mar. 8, 2011)(citing *Coleman v. Astrue*, 2010 WL 4955718 (N.D.Ohio 2010); *Velez v. Comm'r of Soc. Sec.*, 2010 WL 1487599, at *6 (N.D.Ohio 2010)) (remaining citations omitted).

Dr. Douglass gave narrative summaries of the worksheet notations to which Plaintiff refers. With respect to understanding and memory limitations, he opined that "[m]emory and understanding are grossly intact, with mild focal deficits." (Tr. 76.) Within the category of sustained concentration and persistence limitations, he opined that "[c]oncentration will vary, and pace/persistence will be uneven in demanding work settings." (Tr. 77.) With respect to social interactions, Dr. Douglass opined that "[s]ocial functioning is reduced, and [Plaintiff] will work best alone or in small groups." (*Id.*) He ultimately opined that Plaintiff "retains the capacity to

13

perform routine, 2-step tasks on a sustained basis." (*Id.*) Dr. Douglass's final opinion is consistent with and supports the ALJ's RFC, limiting Plaintiff to "simple, routine, repetitive" tasks and limiting the stress and demand in the workplace by limiting changes as well as interactions with co-workers, supervisors and the public. (Tr. 31.) The ALJ properly explained his findings and Dr. Douglass's opinion is substantial evidence supporting the RFC.

## 2. Whether The ALJ Properly Assessed Plaintiff's Moderate Limitations In Maintaining Concentration, Persistence or Pace

Plaintiff argues that the RFC does not adequately account for the ALJ's "B" criteria finding that Plaintiff has "moderate" difficulties in maintaining concentration, persistence or pace. (Doc. 15 at 8.) Plaintiff relies upon *Edwards v. Barnhart*, 383 F.Supp.2d 920 (E.D. Mich. 2005), to argue that the ALJ's limitation to simple, routine and repetitive tasks is insufficient to address moderate limitation in concentration, persistence and pace. *Edwards* is not dispositive. Plaintiff also relies on *Thomczek v. Chater*, 1996 WL 426247 (E.D.Mich. 1996), to equate a "moderate" limitation with the frequency "often."

"Decisions in this district reflect the conclusion that a moderate impairment in concentration, persistence, and pace does not necessarily preclude simple, routine, unskilled work." *Lewicki v. Comm'r of Soc. Sec.*, 2010 WL 3905375, at *2 (E.D.Mich. Sept. 30, 2010) (citations omitted); *see also McNamara v. Comm'r of Soc. Sec.*, 2011 WL 7025855, at *12 (E.D.Mich. Dec 1, 2011). "[T]here is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled work' but excludes a moderate limitation in concentration. Rather, this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's RFC." *Schalk v. Comm'r of Soc. Sec.*, 2011 WL 4406824, at*11 (E.D.Mich. Aug. 30, 2011); *see also Roberts v. Comm'r of Soc. Sec.*, 2011 WL 4407221, at *8-10

(E.D.Mich. Aug. 8, 2011); *Roslund v. Comm'r of Soc. Sec.*, 2012 WL 4513615, at *9-10 (E.D.Mich. Aug. 10, 2012).

Plaintiff does not argue that he has more than a moderate limitation in either social functioning or concentration, persistence or pace and I am unable to find evidence of record that Plaintiff would have more than moderate limitations in these areas. Nor is there evidence that Plaintiff's limitations would manifest in the failure to complete tasks in a timely manner or failure to complete them altogether.

Those circumstances which affect an individual's ability to maintain concentration, persistence or pace will vary. While a limitation to simple, routine and repetitive tasks will not be adequate to address every individual's limitations in concentration, persistent and pace, Dr. Douglass's opinion and worksheet noted that Plaintiff was not significantly limited in carrying out short and simple instructions and his final opinion supports that conclusion. The record shows that in this instance, the ALJ addressed such limitations within context. The RFC also addresses Dr. Douglass's opinion that Plaintiff's pace and persistence will be "uneven" in demanding work settings.  The ALJ's RFC limits the demand of Plaintiff's work setting by limiting Plaintiff to simple, routine and repetitive tasks, thus reducing the complexity and detail of instructions required by the work, and limiting the number of changes. Dr. Douglass also noted that Plaintiff works best alone or in small groups and the RFC limits Plaintiff's exposure to others accordingly. (Tr. 76-77.)

It is worth noting that Plaintiff has not identified other evidence in the record that is inconsistent with the mental limitations set forth in the ALJ's decision. As the ALJ pointed out in her decision, results from intelligence testing were deemed invalid on more than one occasion due to suspected malingering and poor effort on testing. Although Plaintiff has undergone more than

one consultative examination and IQ test, the results have been consistent in that two examiners have found that Plaintiff is exaggerating his difficulties and his IQ scores are invalid. Most recently, Plaintiff was examined and tested by Nathalie Menendes, Psy.D., on September 20, 2010. (Tr. 336-340.) Dr. Menendes concluded that Plaintiff's "self-report cannot be trusted and diagnosing him is difficult. He has a history of exaggerating his difficulties when testing and this evaluator does not have access to any valid IQ scores. As such, his diagnoses are tentative at best. It would be helpful to have access to past school records. His true limitations are unknown." (Tr. 340.) She diagnosed anxiety disorder, mood disorder NOS and assigned a GAF 50.

Plaintiff underwent an Intellectual Evaluation with Mark Zaroff, Ph.D., on April 28, 2008, just prior to the alleged onset date. (Tr. 282-84.) Dr. Zaroff concluded that the results of the WAIS testing that was administered "were deemed invalid due to malingering." (Tr. 284.) Dr. Zaroff specifically noted that in March 2008 testing, malingering was also suspected and he compared the results of the two tests, noting that "[i]n some subtests, the claimant was able to answer questions this time that he was unable to answer in the last administration . . . . On other items, the claimant was not able to answer questions which he answered correctly in the last administration. (e.g., "What is a ship?" In 3/08, he responded "Boat" This time, he responded "Fly.")." (Tr. 283.) It was noted that Plaintiff reported that "he can write his name but nothing else." (Tr. 282.) The examiner noted that Plaintiff "seemed to have a speech impediment, which came and went throughout the interview and testing . . . ." (*Id.*) He was described as having "poor hygiene, had dirty hands and elbows, and his fingernails were long, broken, and dirty." (Tr. 282-83.) "He appeared to be confused by most questions," and often spoke in one word sentences, repeating himself. (Tr. 282.) The examiner noted that Plaintiff reported that he had finished the 10th grade and was in special education classes. (*Id.*)

Dr. Menendes also performed the March 17, 2008 psychological examination. (Tr. 270-72.) She reported that "throughout the interview and the testing, it was felt the claimant was malingering." (Tr. 271.) The doctor noted that Plaintiff "did not put much effort into the tasks." (*Id.*) The Weschler Adult Intelligence Scale-Third Edition (WAIS-III) results were considered "invalid due to malingering." (*Id.*)

In some circumstances, Plaintiff alleged he cannot read. (Tr. 337.) His reports about his abilities and education were inconsistent in the record. The ALJ pointed out that Plaintiff alleged that he was in special education in school and had a learning disability yet school records do not support this assertion. (Tr. 34, 332-34, 374-402.) Although grades were low, it was twice noted that Plaintiff was capable of better work. (Doc. 11-8 at 41, 43; transcript number illegible.) At a consultative physical examination on April 22, 2008, examiner Muhammed Asim Khan, M.D., noted that Plaintiff reported he never went to school for a formal education and he only knows how to write his name. (Tr. 274.) At the hearing, Plaintiff testified that he reads, but loses focus. The ALJ pointed out that Plaintiff was able to complete the Adult Function Report dated July 13, 2009. (Tr. 31, 159.)

With respect to mental limitations, the ALJ cited notes about Plaintiff's presentation at the emergency room that were different from presentations at the psychological examinations. The ALJ cited an emergency room visit when Plaintiff was noted to be alert and oriented, friendly and cooperative. (Tr. 34.)  Other medical records show that Plaintiff was consistently reported to be oriented at appointments; no unusual mental or communicative impairments were noted. On August 15, 2009 Plaintiff was brought to the Emergency Care Center following complaints of low back pain and blood in his urine. (Tr. 568-69.) He was described as "pleasant and cooperative stating that he has no chest pain or difficulty breathing." (Tr. 568.) On September 23, 2008 and

17

May 21, 2009, Plaintiff reported to the health clinic; both times with a list of several complaints and both times he was noted to have appropriate "mood/affect." (Tr. 576-77.) Health center notes from March 12, 2011, also note that Plaintiff was "oriented X3," recent and remote memory were intact, mood and affect were appropriate and insight and judgment were intact. (Tr. 433, see also tr. 432.)

At an April 19, 2010 hospital examination, the doctor described Plaintiff as easily arousing from sleep and reported that "he is alert and oriented to person, place, and time. He does not appear to be in any acute distress. He has good hygiene and grooming and he is friendly and cooperative." (Tr. 562.) Under the neurological system review, he was noted to be "grossly intact" and "[h]is speech is clear." (Tr. 563.) At the April 20, 2010 consultation for chest pain, Dr. Zhu described Plaintiff as "very pleasant" and neurologically "grossly intact." (Tr. 557.) Upon physical examination at the health center on June 4, 2010, Plaintiff reported auditory hallucinations, yet it was noted that Plaintiff's judgment and insight were "intact" and he was "oriented to time, place and person." (Tr. 548-50.)

Plaintiff reported to the emergency department on July 10, 2011 with complaints of ankle and foot pain. (Tr. 496-99.) On examination Plaintiff was reported to be "[c]omfortable, [a]lert and oriented X 3, patient is alert, cooperative, talking in full sentences without any difficulty." (Tr. 496.) The records from September 2010 and July and August 2011 note that Plaintiff "lives alone" and denied any psychiatric history.[4] (Tr. 477-78, 483, 495.)

---

[4]It is worth noting that some medical records from 2010 report that Plaintiff was residing with a wife yet his own reports from 2009 and the hearing testimony indicate he lives alone and that his mother and someone else come over once a week to assist him. (Tr. 152, 154, 336.) Dr. Zhu's consultative cardiac report from April 2010 noted that Plaintiff "is married. He has 3 children with 2 sons. He still lives with his wife." (Tr. 556.) At an appointment on July 1, 2010, it was noted that Plaintiff "is here with his wife" and that his wife "states that he snores loud and sometimes stops breathing for a few seconds at night." (Tr. 546.) Some 2010 and 2011 records note his marital status as "single." (Tr. 439, 528.) Notes from a medical exam on July 16, 2011 make reference to Plaintiff's

I conclude that the ALJ properly considered Plaintiff's impairments and resultant limitations and explained her findings. The record does not support more severe mental limitations than those set forth in the RFC. In a hypothetical question posed to the VE, an ALJ is required to incorporate only those limitations which she finds credible and supported by the record and the ALJ did so. *See Casey v. Sec'y of Health and Human Serv.*, 987 F.2d 1230, 1235 (6th Cir. 1993). I further conclude that the ALJ properly considered the evidence of record and her RFC is supported by substantial evidence. The VE's testimony is additional substantial evidence supporting the ALJ's finding that Plaintiff could perform a substantial number of jobs in the economy. The ALJ's findings at step five are supported by substantial evidence.

## G.    Conclusion

Accordingly, I suggest that the ALJ's decision to deny benefits was within the range of discretion allowed by law, it is supported by substantial evidence and there is simply insufficient evidence to find otherwise. Defendant's Motion for Summary Judgment (doc. 18) should be granted, that of Plaintiff (doc. 15) denied and the decision of the Commissioner affirmed.

## III.    <u>REVIEW</u>

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others,

---

"partner." (Tr. 432.)

will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan,* 474 F.3d 830, 837 (6th Cir. 2006) (*citing Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987)). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  E.D. Mich. LR 72.1(d)(3). The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

s/ Charles E Binder

CHARLES E. BINDER
Dated: October 28, 2014          United States Magistrate Judge

20